# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DAVID CHANIOTT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:19-cv-00222** |
| | ) | **Judge Aleta A. Trauger** |
| **DCI DONOR SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM

DCI Donor Services, Inc. ("DCI") has filed a Motion for Summary Judgment (Docket No. 24), to which David Chaniott has filed a Response (Docket No. 35), and DCI has filed a Reply (Docket No. 39). For the reasons set out herein, the motion will be denied.

## I. BACKGROUND

DCI is an organization that operates tissue banks and organ procurement organizations. (Docket No. 26-5 ⁋ 2.) Chaniott began working for DCI as a donation specialist in January of 2014. (Docket No. 40[1] ¶ 1.) Chaniott was originally assigned to the night shift—6:30 p.m. to 6:30 a.m.—where he remained until, in 2016, he was transferred to "mid shift"—a twelve-hour shift beginning around mid-day. (*Id.* ¶¶ 2–3.) In 2017, he was moved to day shift. (*Id.* ¶ 4.) While Chaniott was assigned to the night shift, he experienced physical symptoms associated with anxiety, including inability to catch his breath, heart pounding, fear, inability to focus, and exhaustion. (*Id.* (Add'l

---

[1] A single document on the docket includes DCI's original asserted undisputed facts, Chaniott's responses, DCI's replies to some of those responses, Chaniott's asserted additional facts, and DCI's responses to those facts. This consolidated document has two sets of paragraph numberings starting at 1. Unless the court parenthetically indicates that it is referring to Chaniott's Additional Statement of Facts, the court is citing to the first set of paragraphs.

Statement) ¶ 2.) Chaniott testified in his deposition that, when he was on the day shift, his symptoms improved, and he realized how much he had been struggling while on the night shift. He was offered a promotion to a better-paying position that would have required him to return to the night shift, and he turned it down. (Docket No. 36-1 at 29–31.)

On March 22, 2018, Chaniott was informed that he was being reassigned back to the night shift. (Docket No. 40 ¶ 5.) He describes the reassignment as bringing on a "4-day long panic attack." (*Id.* (Add'l Statement) ¶ 6.) On March 26, 2018, he had his first night shift of the reassignment. (*Id.* ¶ 6.) The next day, he spoke on the telephone with several DCI managers and employees—specifically, Senior Human Resources Generalist Joe Garavaglia, Corporate Executive Director Jill Grandas, Director of Human Resources Teresa Bledsoe, and a colleague of Chaniott's named Jeff—about his work schedule going forward. He told them that he believed that he was unable to work the night shift for a medical reason. (*Id.* ¶ 7.) Chaniott later explained to Garavaglia that the health issue was mental health-related, but he did not provide the details of any diagnosis or symptoms. (*Id.* ¶ 8.)

On March 27, 2018, Chaniott had a phone call with Bledsoe and Garavaglia to discuss the situation and to inform them that he would be calling in sick for the next two shifts. (*Id.* ¶ 10; Docket No. 26-5 ¶ 3.) Chaniott explained that he suffered from anxiety and depression and was under the care of a psychologist. He explained that he had struggled with these mental health symptoms for years and had come to understand that working the night shift exacerbated them. As the discussion of Chaniott's symptoms continued, he further explained that his depression and anxiety we accompanied by a form of behavioral addiction.[2] According to Chaniott, the reason he

_____

[2] Up to this point, the parties have relied on seals to protect aspects of Chaniott's privacy. In the court's experience, the litigation of claims such as Chaniott's usually results, eventually, in some substantial loss of personal privacy on behalf of the plaintiff—as is indeed the case in many types of litigation, from divorce to disability benefits to malpractice. There is a limit to the degree to which parties can rely on seals to

2

disclosed the nature of his addiction was that Bledsoe told him he would have to do so. (Docket No. 40 ¶¶ 11–13.)

Chaniott explained that, because of the effect that the night shift had on his anxiety and depression, he would medically need to be excused from his upcoming shifts and would ultimately need to be reassigned to the day shift. Bledsoe informed him that he would need a doctor's note for any absences. According to Bledsoe, she also recommended that he get a health care provider's opinion regarding whether he could work the night shift. Chaniott testified that Bledsoe did tell him about the need for a note for absences, but he says that he does not recall being told that he would need a doctor's note to substantiate his need to be moved to the day shift. (*Id.* ¶ 14.)

DCI concedes that Bledsoe never gave Chaniott any paperwork for his healthcare provider to fill out. DCI also concedes that its "interactive [Americans with Disabilities Act ("ADA")] process is supposed to include giving the employee documents along with the job description so it would be clear to the employee's doctor to define their limitations and identify if the disability is permanent or temporary so that HR can then assess the employee's position to determine whether they can make a reasonable accommodation." (*Id.* (Add'l Statement) ¶¶ 8, 11–13.) Bledsoe and Garavaglia, however, testified that it was DCI's policy only to provide the paperwork after receiving, from the employee's physician, an "initial notification of what [the employee's] diagnosis or work restrictions were"—that is, an initial doctor's note. (Docket No. 36-2 at 48;

---

protect personal privacy while continuing to comport with the general principle of open courts. For the time being, however, the court will strive to discuss the details of Chaniott's symptoms only to the degree necessary for explaining and analyzing this case. What is necessary to understand about Chaniott's addiction is that (1) it is not related to drugs or alcohol, (2) it is a type of addiction that may result in some social stigma, (3) it is a type of addiction associated with behavior that would not be appropriate if a person engaged in that behavior in the workplace, and (4) there is no evidence in the record that Chaniott ever engaged in workplace-inappropriate behavior related to his addiction.

Docket No. 36-3 at. 38). Bledsoe told Chaniott not to come in to work for the time being, which she testified was in direct response to learning of his addiction. (Docket No. 36-2 at 42.)

On March 31, 2018, Chaniott obtained a note from a treating physician, Dr. Daniel Woods, stating, "Mr. David Chaniott has provided informed consent to report that he attended a consultation at this office on Wednesday, March 28, 2018 and that he intends to continue future consultations." The note did not discuss any necessary restrictions or work accommodations for Chaniott. He provided the note to DCI. (*Id.* ¶¶ 17–19.)

On April 3, 2018, Chaniott met with Bledsoe and Garavaglia. (*Id.* ¶ 20.) Although the parties differ in their characterizations of the conversation, they agree that Bledsoe told Chaniott that, in order for DCI to grant him a disability-related shift accommodation, he would need to provide a letter from a physician stating that an accommodation was necessary. (*Id.* ¶¶ 19, 21.) DCI concedes that, during this discussion, Bledsoe focused exclusively on Chaniott's behavioral addiction—perhaps the most salacious aspect of his claimed symptoms, but not actually the one he was seeking accommodation for. (Docket No. 40 (Add'l Statement) ¶ 27.) In her deposition testimony, Bledsoe explained that her focus on Chaniott's addiction, rather than on his alleged depression or anxiety, was because she believed, based on their conversations, that the depression and anxiety were a result of the addiction. (Docket No. 36-2 at 62.) Bledsoe's notes from this conversation confirm that she was concerned about the possibility of "potential employer liability" arising out of Chaniott's potential addiction-related behavior toward or around other employees. (Docket No. 36-10 at 2.)

On April 4, 2018, Chaniott saw Dr. Wood again and requested a note regarding his work limitations. Dr. Wood was unwilling to provide a note at that time. Chaniott maintains that this was because Dr. Wood wished for him to see an occupational specialist for a more expert opinion.

(*Id.* ¶¶ 19, 22.) On April 5, 2018, Chaniott emailed Bledsoe to inform her that Dr. Wood was unable to "give an opinion one way or another if I am able to work." Chaniott explained that Dr. Wood had told him that he would need to see an occupational specialist, and he asked Bledsoe if she knew where he could find one. (Docket No. 40 ¶ 23.) Chaniott also asked Bledsoe if he could use the company's Extended Sick Bank, or "ESB," for his absences, but Bledsoe responded by telephone that, to do so, he would need adequate medical documentation. (Docket No. 36-10 at 3–4.)

On April 6, 2018, Chaniott spoke on the phone to Garavaglia and Bledsoe. Bledsoe complained about not yet having documentation to support Chaniott's requested reassignment, and she told him that some at DCI were beginning to become suspicious that he simply wanted to avoid the night shift but did not have a disability that required him to do so. (Docket No. 40 ¶¶ 26–27.) Bledsoe's notes documenting this discussion confirm her continued concern that Chaniott might engage in behavior related to his addiction that would pose a problem for the company. The notes state that she told him that, even if he obtained a note documenting his condition and need for an accommodation, he might still not be allowed to return to work. According to the notes, she also told him that she would be unable to refer him to an occupational specialist. (Docket No. 36-10 at 4.)

The scheduling of hours at DCI was handled by a man named Nathan Luttrell. In early April, amidst Chaniott's discussions with Bledsoe, Chaniott communicated with Luttrell, and Luttrell scheduled him for a day shift. Luttrell also told Chaniott that Luttrell and another DCI decisionmaker had decided to return him to the day shift. Apparently, however, no such decision had been finalized, and it is unclear whether reassigning him to day shift would have been

5

consistent with the company's needs at the time. (Docket No. 40 (Add'l Statement) ¶¶ 21–25.) Bledsoe continued to tell Chaniott not to return to work. (*Id.* (Add'l Statement) ¶ 26.)

On April 11, 2018, Chaniott saw Dr. Wood again and obtained a letter addressing the issues that Dr. Wood was willing to address. Dr. Wood wrote:

> Mr. David Chaniott has provided informed consent to report that he is currently receiving ongoing treatment for depressed and anxious mood.
>
> Further, Mr. Chaniott has encountered debilitating sleep disturbance and mood deterioration when fulfilling a night shift schedule in the past. Currently, it can be expected that such a shift would exacerbate mood and sleep difficulties if accommodation for alternative work shifts cannot be implemented.

(Docket No. 36-9 at 3.)

In the meantime, however, DCI had decided to terminate Chaniott. According to Bledsoe, she had come to believe that Chaniott was not being honest with her or the company about his supposed disability and was merely attempting to avoid the night shift. This behavior, in her view, warranted termination. (Docket No. 40 ¶ 30.) Bledsoe discussed the decision to terminate Chaniott only with Grandas, Watson, and legal counsel. In so doing, Bledsoe shared the details of Chaniott's addiction with Grandas, which Grandas testified was unusual, as Bledsoe did not usually share employee medical information. (*Id.* (Add'l Statement) ¶¶ 38–39.) DCI concedes that Bledsoe did not ever inquire with Chaniott's supervisors about whether he could feasibly be moved to the day shift. (*Id.* (Add'l Statement) ¶¶ 41–43.)

DCI terminated Chaniott through a letter signed by Bledsoe dated April 12, 2018. (*Id.* ¶ 31; Docket No. 36-12 at 13.) Bledsoe wrote:

> In our [March 27] conversation, and on several occasions since that conversation, I have been requesting that you provide a doctor's note confirming the following:
>
> 1.      your condition;

6

2.	your inability to work night shift due to the condition as you had represented; and

3.	clarification that you could work in the [DCI] workplace environment (with or without accommodation) in light of that condition.

Despite my continued requests for this information, you have not provided the documentation addressing these issues. Given the lack of proper documentation, [DCI] concludes that you were not being truthful when you claimed an inability to work night shift and were not being truthful in claiming you suffered from an addiction.

As a result, your employment is terminated effective April 12, 2018. Should you have any further questions, please contact me at [phone number].

(Docket No. 36-12 at 13.) When Chaniott received the letter, he had not yet provided his most recent doctor's note to DCI. Thereafter, he did not contact Bledsoe to inform her that he had, in fact, gotten the note, and he did not provide DCI with the note in an attempt to obtain reinstatement. (Docket No. 40 ¶ 29.) Chaniott concedes that he does not know of any comparator employees who raised a shift-related medical issue but were unable to provide supporting documentation. (*Id.* ¶ 40.)

Dr. Wood has given two Declarations for this case. Dr. Wood wrote that "Chaniott met criteria for Obsessive Compulsive Disorder . . . ." (Docket No. 26-7 ¶ 8.) According to Dr. Wood, however, Chaniott did not meet the DSM-IV criteria for any other mental health diagnosis. (*Id.* ¶ 9.) Specifically, "In 2014 and 2018, . . . Chaniott presented with mixed dysthymic mood and anxiety, but he did not," in Dr. Wood's opinion, "meet DSM-IV diagnostic criteria for a diagnosable Depression Disorder or a diagnosable Anxiety Disorder." (*Id.* ¶ 10.) Dr. Wood further stated that he was "unaware of any psychological condition that would preclude Mr. Chaniott from any available work shifts." (*Id.* ¶ 15.) "Although work schedule options and work environment were discussed in session," Dr. Wood said, "Chaniott was never instructed, directed, or advised to

alter his work schedules." (*Id.* ¶ 14.) Dr. Wood explained that the final, more detailed letter he provided "at [Chaniott's] insistence" did reflect specific symptoms that Chaniott reported experiencing at the time. Those symptoms, however, did not alone support any DMS-IV diagnosis, because they did not meet the minimum requirements for "severity (number of symptoms present), duration (specified time frame for symptoms to be present most days, all day), or compromised functional requirements (inability to maintain activities of daily living , maintain appropriate hygiene, work schedule, cooking, shopping, etc.)." (Docket No. 36-8 ¶¶ 11, 15.)

From 2016 to 2019, Chaniott was continuously treated by a licensed family therapist, Stephen Navyac, for his mental health-related symptoms. (Docket No. 40 (Add'l Statement) ¶ 3.) As a licensed therapist, Navyac is authorized, within his scope of practice, to diagnose patients with mental health conditions. Navyac, however, never diagnosed Chaniott with any particular condition or disorder. He testified that that he "tread[s] carefully with a diagnosis" because "putting a label of a diagnosis on a client . . . can have a large negative effect." (Docket No. 40 ¶ 46; Docket No. 36-2 at 15–16.) Navyac agreed that, regardless of Chaniott's diagnosis or lack thereof, "anxiety was a constant issue in his life." (Docket No. 36-2 at 22.) During his deposition, Navyac was asked whether he had "ever come to an opinion . . . such that [he] advised . . . Chaniott no longer work nights at work." Navyac responded that he had not. (Docket No. 36-7 at 19.)

On March 12, 2019, Chaniott filed his Complaint in this court. (Docket No. 1.) He pleaded three counts. Count I is for disability discrimination and retaliation under the ADA, 42 U.S.C. § 12101 *et seq.* Count II is for disability discrimination under the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-103. Count III is for violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* (*Id.* ¶¶ 27–51.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. ADA Discrimination[3]

---

[3] DCI does not raise any arguments specific to the TDA, relying instead on the principle that the TDA is mostly governed by the same standards as the ADA. *But see Bennett v. Nissan N. Am., Inc.*, 315 S.W.3d 832, 841–42 (Tenn. Ct. App. 2009) ("The TDA elements are very similar to those of the ADA, but do not include a 'reasonable accommodation' component.") (citing *Roberson v. Cendant Travel Servs., Inc.*, 252 F.Supp.2d 573, 583 (M.D. Tenn. 2002)). Because DCI has chosen to limit itself to arguments available under the ADA, the court will not include any separate analysis of potential TDA-related issues.

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "Discrimination" under the ADA includes an employer's failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A); *accord Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007). A plaintiff asserting a claim of failure to accommodate under the ADA must show that he (1) has a disability, (2) was qualified for the relevant job, and (3) requested a reasonable accommodation and was denied, or was subject to an adverse employment decision that was made because of his disability. *Dumas v. Hurley Med. Ctr.*, 837 F. Supp. 2d 655, 665 (E.D. Mich. 2011); *Jackson v. O'Reilly Auto. Stores, Inc.*, No. 3:12-cv-1215, 2014 WL 993269, at *6, 8 (M.D. Tenn. Mar. 12, 2014).

DCI does not deny that a request to move from the night shift to the day shift can be an appropriate accommodation for a disabled employee, nor does it dispute that Chaniott requested such a change and cited his mental health in doing so. DCI argues, however, that Chaniott cannot establish that he was actually disabled, that he never provided appropriate support for his requested accommodation, and that he was fired, not because he was disabled or requested an accommodation, but because DCI came to believe that he was being dishonest about his condition.

1. Existence of Disability

Under the ADA, "disability" means either (1) a physical or mental impairment that substantially limits one or more major life activities, (2) a record of such an impairment, or (3) being regarded by one's employer as having such an impairment. 42 U.S.C. § 12102(1). DCI argues that Chaniott did not suffer from an impairment covered by the ADA because there is no

10

evidence in the record to support an actual DSM-IV diagnosis of either anxiety or depression, the only conditions that he cites in support of his claim.

DCI, however, has identified neither caselaw nor any statutory rationale that would support concluding that the ADA definition of disability necessarily tracks the precise diagnostic criteria of the DSM. There is, in fact, a great deal of evidence in the record that Chaniott suffered from mental health *symptoms*, particularly those related to anxiety, for which he has received years of treatment. It is true that no healthcare provider has been willing to conclude that Chaniott can check a sufficient number of boxes for specific classification as suffering from a particular DSM-recognized illness or disorder related to depression or anxiety. Nothing in the text of the ADA, however, suggests that he must have a particular DSM diagnosis, as long as his condition and symptoms are real and otherwise qualify under the definition of disability. Indeed, as courts have observed, the DSM-IV itself warns readers looking to rely on it in a legal context about the "imperfect fit between the questions of ultimate concern to the law and the information contained in a clinical diagnosis." *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 155 n.18 (1st Cir. 1998); *accord Harper v. Beard*, No. 1:08-CV-2272, 2010 WL 3855197, at *1 n.1 (M.D. Pa. Sept. 28, 2010). *Cf. Braggs v. Dunn*, 321 F.R.D. 653, 665 n.4 (M.D. Ala. 2017) (approving class action ADA settlement that reached some impaired individuals who fell short of one criterion for the relevant DSM diagnosis). The ADA expressly provides that the definition of disability "shall be construed in favor of broad coverage." 42 U.S.C. § 12102(4)(A). It would be inconsistent with that edict to hold that an employee's real, disabling symptoms are not addressed by the ADAD simply because they fail to fall into a particular category based on a checklist in a document that was not made for the purposes of adjudication.

Moreover, the primary basis for Dr. Wood's concluding that Chaniott did not qualify for a DSM diagnosis was that his claimed acute anxiety after his reassignment to night shift was not representative of his usual mental health. The ADA, however, dictates that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 42 U.S.C.A. § 12102(4)(D). ADA regulations expressly provide that the "effects of an impairment lasting or expected to last fewer than six months can be substantially limiting" for purposes of proving an actual disability. 29 C.F.R. § 1630.2(j)(1)(ix). It is therefore not necessarily sufficient for DCI to rely on the fact that Chaniott's symptoms of anxiety were usually not disabling or had not been disabling before. Episodic, acute exacerbations of a symptom, if they interfere in a substantial life activity, can be enough to warrant consideration of an accommodation under the ADA.

The ADA defines "major life activities" to "include . . . caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working" 42 U.S.C. § 12102(2)(A). Chaniott has provided some evidence that his anxiety symptoms, in their most acute state, interfered with his sleeping, thinking, and working. Although the medical evidence is weaker in this case than in most cases in which a plaintiff establishes a mental health disability, the court cannot conclude that a reasonable juror would be incapable of being convinced by Chaniott's evidence. In particular, Navyac, who had the most extensive history of treating Chaniott, confirmed the existence of his anxiety-related symptoms, regardless of Navyac's own reluctance, for treatment reasons, to peg a patient's symptoms to a particular diagnosis. A reasonable juror could credit both Navyac's discussion of Chaniott's symptoms and Chaniott's first-person account of their interference in his life activities.

12

Chaniott also argues, as a separate basis for finding a disability under the ADA, that, regardless of his actual diagnosis, DCI, and Bledsoe in particular, regarded Chaniott as disabled. *See Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 310–11 (6th Cir. 2019) ("Under the Americans with Disabilities Act, your employer can't fire you because they *think* you are disabled, even if, in fact, you are *not* disabled."). There is ample evidence that Bledsoe was concerned that Chaniott's condition was real and serious. Indeed, she seems to have feared that he may have been incapable of safely and competently working even a single shift at DCI. The question of whether she regarded him as disabled is complicated somewhat, however, by Bledsoe's focus on Chaniott's addiction over his other symptoms. ADA regulations include carveouts related to certain addiction-related and behavioral conditions, which either exclude the underlying conditions from the ADA altogether or set certain requirements that must be met in order for the condition to fall within the ADA definition of "disability." *See* 29 C.F.R. § 1630.3. As relevant to this case, 29 C.F.R. § 1630.3(d)(1) excludes a particular class of "behavior disorders" that arguably includes Chaniott's addiction. Therefore, insofar as DCI regarded Chaniott only as suffering from addiction, it would not qualify as a disability under the ADA.

Chaniott, however, always made clear to Bledsoe and DCI that addiction was not his only problem. Moreover, although Bledsoe focused on the addiction, apparently for what she perceived as potential liability-based reasons, her testimony confirms that she was aware of Chaniott's claimed anxiety and depression symptoms as well. Moreover, there is no evidence that Bledsoe had any basis for believing that Chaniott's actual work-related impairment arose out of addictive behaviors rather than anxiety. Bledsoe perceived Chaniott's addiction and his anxiety as closely related, which may have been the case, as addiction is often intertwined with other mental health symptoms. DCI has identified no basis, however, for concluding that an employee's diagnosis of

a behavioral condition excluded from the ADA would somehow negate a (perceived) disability based on a non-excluded condition, simply because the two share some psychological interrelation. Bledsoe's regarding Chaniott as having addiction-related anxiety and depression, therefore, is just as sufficient as her regarding him as having anxiety and depression in a vacuum.

Chaniott's reliance on the "regarded as" portion of the definition of disability faces another obstacle in the fact that, unlike the definition of actual disability, regarded-as disability typically does not include transient conditions. *See* 29 C.F.R. § 1630.2(j)(1)(ix). However, the issues related to the duration of Chaniott's more severe symptoms arise out of medical testimony that Bledsoe had no access to at the time she considered his condition and terminated him. The court therefore cannot assume that DCI regarded Chaniott's anxiety and depression to be transient at the time of his requests. The possibility that DCI regarded Chaniott as suffering from anxiety and depression that interfered with major life activities, including work, therefore provides an additional potential basis for liability.

2. Pretext

Although "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence" in the form of the denial of the accommodation itself, *Kleiber*, 485 F.3d at 868, discrimination under the ADA can also be shown by indirect, or circumstantial, evidence. A plaintiff may prove employment discrimination under the ADA based upon circumstantial evidence using the *prima facie* case and burden shifting method articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). A *prima facie* termination case under the ADA "requires a plaintiff to establish that (1) he is a disabled person within the meaning of the ADA, (2) he is qualified, that is, with or without reasonable

14

accommodation which he must describe, he is able to perform the essential functions of the job, and (3) the employer terminated him because of his disability." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998) (citing *White v. York Int'l Corp.*, 45 F.3d 357, 360–61 (10th Cir. 1995)). Once the plaintiff establishes his *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). If the defendant can satisfy this burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination. *Id.*

DCI does not appear to dispute that, if Chaniott can establish a disability, he otherwise can establish his *prima facie* case. There is no evidence that Chaniott was otherwise unqualified for his job, and DCI's decision to terminate him was, all parties agree, a direct outgrowth of the process surrounding his claim of disability and his request for an accommodation—which is enough, at the *prima facie* case stage, to establish a causal link. Chaniott, in turn, does not appear to dispute that DCI has offered a legitimate nondiscriminatory reason for his termination—namely, that he failed to provide requested medical documentation, causing the company to believe that he had been dishonest during the reasonable accommodation request process.

An employee seeking to show that the reason given for the adverse action against him was pretext may do so by showing that "the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 539 (6th Cir. 2014) (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (*en banc*)). The finder of fact, in making a determination regarding pretext, can rely on all of the ordinary, "commonsense" methods available to him for discerning the truth on a contested issue of fact.

*Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 811 n.10 (6th Cir. 2020) (noting that the "three-part test" for pretext should not be treated "rigidly" and noting that the plaintiff's arguments, regardless of how initially characterized, could fit into the first or second parts of the test). For example, "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext," because a reasonable finder of fact could conclude that the shifting rationales undermine the credibility of the employer's assertions regarding what actually motivated its decision. *Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 847 (6th Cir. 2015) (quoting *Cicero v. Borg–Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002)).

Chaniott questions whether the *McDonnell Douglas* framework is necessary in this case, because he argues that the evidence that he was terminated due to his disability is not circumstantial but direct. There is some merit to that argument; it is undisputed in this case that, at the very least, the events occurring during the process surrounding Chaniott's request for a disability-based accommodation was the reason for his termination. Whether one uses the *McDonnell Douglas* framework or not, however, the ultimate question is fundamentally the same in this instance— whether a reasonable juror could reject DCI's claim that Chaniott was fired for dishonesty, not for his disability.

Chaniott has identified multiple pieces of evidence to support an inference of pretext. He notes, in particular, Bledsoe's failure to give him any paperwork related to requesting an accommodation or seeking FMLA leave, as well as the fact that Bledsoe blocked his return to DCI. He notes also his past history of exemplary performance at his job, his lack of any prior issues related to his honesty at work, the fact that his supposed delay in obtaining documentation was relatively short, and the fact that he kept DCI abreast of his process of seeking an acceptable physician's note. Further, he points to Bledsoe's apparent lack of interest in addressing,

16

understanding, or inquiring about his anxiety and depression, in favor of a singular focus on his addiction. Indeed, while DCI has been consistent in its rationale for the termination since it happened, the evidence preceding the termination strongly suggests that Bledsoe was considering firing him specifically for his addiction diagnosis. The sudden about-face of claiming not to believe that the addiction even existed, as Bledsoe did in the termination letter, could reasonably be construed as suspicious.

The court agrees that a reasonable juror could examine the circumstances of Chaniott's dismissal, as well as the circumstantial facts he has highlighted, and conclude that DCI's reasoning was pretextual. While it is certainly possible that Bledsoe earnestly believed that Chaniott had been dishonest, the actual circumstantial case for jumping to that conclusion at the time was fairly limited, and Chaniott has provided potentially persuasive grounds for being skeptical of that account. The court therefore will not grant DCI summary judgment with regard to Chaniott's ADA discrimination claim on this basis.

### 3. Reasonable Accommodation/Failure to Engage in an Interactive Process

When an employee informs his employer that he has a disability that would require an accommodation, the employer has a duty under the ADA to engage in an "interactive process" with the employee in an attempt to determine whether, based on an individualized assessment of the employee's needs, a reasonable accommodation is possible. *Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014). "[F]ailure to engage in the interactive process is . . . an independent violation of the ADA if the plaintiff establishes a prima facie showing that he proposed a reasonable accommodation." *Rorrer v. City of Stow*, 743 F.3d 1025, 1041 (6th Cir. 2014).

DCI does not dispute that a shift change would, or at least could, have been a reasonable accommodation if Chaniott had been disabled in the manner that he claims. Rather, DCI raises two

grounds for granting it summary judgment with regard to its alleged failure to engage in an interactive process and failure to accommodate: (1) Chaniott was not disabled; and (2) Chaniott failed to provide DCI's requested paperwork. The court has already concluded that summary judgment is not appropriate on the question of whether Chaniott was disabled. DCI's motion for summary judgment therefore depends on its argument that Chaniott's failure to provide an adequate physician's note precludes his prevailing on either of these theories.

"The employee must initiate the interactive process by requesting an accommodation." *Vaughn v. Parkwest Med. Ctr.*, 716 F. App'x 428, 434 (6th Cir. 2017) (citing *Gantt*, 143 F.3d at 1046). However, "an employee need not use the magic words 'accommodation' or even 'disability,' [but] the request does need to make it clear from the context that it is being made in order to conform with existing medical restrictions." *Leeds v. Potter*, 249 F. App'x 442, 449–50 (6th Cir. 2007) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). "What matters under the ADA," at least with regard to the initial notice of a disability and the request for accommodation, "are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999); *see also Thompson v. E.I DuPont deNemours & Co.*, 140 F. Supp. 2d 764, 774 n.8 (E.D. Mich. 2001) ("[T]he Court notes that its research has not uncovered a single Sixth Circuit case in which an employee's 'vague' request [for an accommodation] wholly excused the employer from any further inquiry").

There is little doubt that a reasonable juror could conclude that Chaniott made an initial request sufficient to trigger the obligation to engage in an interactive process. He requested an

18

accommodation and repeatedly made clear that it had a medical basis. He was therefore entitled to an interactive process built around "communication and good-faith exploration of possible accommodations" by both the employee and employer. *Kleiber*, 485 F.3d at 871 (*quoting Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000)). As part of that good faith process, an "employer[] may require documentation supporting an employee's requested accommodation" under the ADA. *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 812 (6th Cir. 2020).

DCI argues that Chaniott's failure to obtain an adequate physician's note in a timely fashion amounted to bad faith, relieving DCI of any obligation to take any further steps in the interactive process. Chaniott, however, has presented evidence from which a reasonable juror could conclude that he was acting in good faith in his efforts to obtain appropriate documentation. If anything, it would seem that Chaniott was scrambling to do so. Dr. Wood appears to have been hesitant to speak on the issue of occupational limitations, but there is no reason to assume that the ADA's interactive process should not make time and room for obtaining opinions from multiple healthcare providers. DCI, moreover, strikingly failed to engage in any collaborative effort to move the process along, including by doing things that it easily could have done—such as providing Chaniott with a written job description or particular paperwork for a healthcare provider to fill out or assisting him to find an occupational therapist, as he requested. Bledsoe's testimony and actions suggest that she proceeded under the assumption that Chaniott had to meet certain formal criteria, such as a note from a physician, before triggering any meaningful duty on behalf of DCI—an attitude directly contrary to the informal, collaborative character of the process governing the initiation of an interactive process.

Moreover, insofar as an employee's delay in obtaining justification can justify an employer's abandoning the interactive process, DCI has not provided any basis for concluding that

the delay here was sufficient. For example, in *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, the employer's rejection of the employee's request for an accommodation was found to have been permissible because the employee had failed to provide adequate documentation for a period of several months. *Id.* At 813. Construing the facts in the light most favorable to Chaniott, he did not understand what kind of documentation was being requested until April 3, 2018. He was terminated on April 12, 2019. The premise that an employee seeking an accommodation must, with little or no help from his employer, obtain appropriate documentation in nine days or be fired cannot be reconciled with a good faith interactive process. Because a reasonable juror could conclude that Chaniott acted diligently and in good faith to attempt to obtain documentation, while DCI offered little guidance or assistance, the court will not grant summary judgment with regard to this aspect of his ADA claim.

## B. ADA Retaliation

Under the ADA's retaliation provision, it is unlawful to "discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. § 12203(a). To establish a prima *facie case* of retaliation, Chaniott must show that (1) he engaged in activity protected by the ADA; (2) DCI knew of this exercise of his protected rights; (3) DCI subsequently took an employment action adverse to Chaniott or subjected Chaniott to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the adverse employment action. *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422, No. 14–1824, 2015 WL 5332531, at *7 (6th Cir. Sept. 14, 2015) (citing *Steward v. New Chrysler*, 415 F. App'x 632, 643–44 (6th Cir. 2011)). As in the discrimination context, "[i]f the plaintiff establishes a *prima facie*

case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997). The plaintiff then bears the burden of proving that the defendant's "proffered reason for the action was merely a pretext for discrimination." *Id.* (citation omitted).

"[R]equests for accommodation are protected acts" for the purposes of an ADA retaliation claim. *Hurtt*, 627 F. App'x at 422 (citing *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013)). DCI knew of Chaniott's request and it fired him, satisfying the next two prongs of the *prima facie* case. DCI argues, however, that Chaniott cannot establish a causal link between his request for an accommodation and his firing because the request was not a but-for cause of the termination. *See Allman v. Walmart Inc.*, 418 F. Supp. 3d 224, 231 (S.D. Ohio 2019) ("To prove a causal link, the plaintiff must prove that 'but for' his protected activity [his employer] would not have taken the alleged adverse employment action.") (citing *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015)). But the request *was* a but-for cause of the termination, even by DCI's telling of events. If Chaniott had not requested an accommodation, he never would have been asked to explain his disability and never would have been asked to produce a physician's note. DCI therefore would have had no reason to conclude, as it claims it did, that he was acting dishonestly, and he would not have been fired. DCI's argument, therefore, is not properly directed at Chaniott's *prima facie* case.

Rather, DCI's argument is actually about its legitimate nondiscriminatory reason for its action and Chaniott's supposed inability to establish pretext. As the court has already held, however, pretext in this case is reasonably debatable and inappropriate for summary judgment. A reasonable juror could doubt DCI's account based on how quickly it claims to have jumped to the conclusion that Chaniott was lying, its general hostility to his request, Bledsoe's standing in the

21

way of Chaniott's reassignment, and Chaniott's history of quality work for DCI, among other things. The court therefore will not grant summary judgment to DCI with regard to the ADA retaliation claim.

## C. FMLA

As the basis for Chaniott's FMLA claims, his Complaint states that he "was entitled to receive FMLA leave," but DCI "failed to offer Plaintiff FMLA leave while holding him out of work." (Docket No. 1 ¶¶ 44–45.) Chaniott points out that DCI's ordinary policy was that, if an employee asked to miss more than three days' work for a medical reason, DCI would request that he apply for FMLA leave. (See Docket No. 36-3 at 14.) Chaniott missed more than three days' worth of shifts while he pursued an accommodation, but he was not provided any FMLA paperwork or asked to use his FMLA rights, and he was fired rather than being allowed to return.

The FMLA entitles eligible employees to take up to twelve weeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Employees who return to work within the twelve-week statutory period are entitled to return to their previous position or an equivalent position. 29 U.S.C. § 2614(a)(1). "An employer violates the FMLA when it 'interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise' FMLA rights." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427 (6th Cir. 2014) (quoting 29 U.S.C. § 2615(a)(1); citing *Bryson v. Regis Corp.*, 498 F.3d 561, 569–70 (6th Cir. 2007)). The FMLA also prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful" under the FMLA. 29 U.S.C. § 2615(a)(2).

As these different grounds for liability relate to individuals who are ultimately terminated, the Sixth Circuit has stated:

> Although . . . a claim for retaliatory discharge is cognizable under either [interference or retaliation], the requisite proofs differ. The interference theory has its roots in the FMLA's creation of substantive rights, and if an employer interferes with the FMLA-created right to medical leave or to reinstatement following the leave, a violation has occurred, regardless of the intent of the employer. The central issue raised by the retaliation theory, on the other hand, is whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.

*Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012) (internal citations and quotation marks omitted). An employee may prove either FMLA interference or retaliation using the *McDonnell Douglas* burden-shifting framework, although the particular elements of the *prima facie* case under each theory differ. *Demyanovich*, 747 F.3d at 427; *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012).

1. Interference

To establish a *prima facie* case of FMLA interference under § 2615(a)(1), the plaintiff must demonstrate that (1) he was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the plaintiff was entitled to leave under the FMLA; (4) he gave the employer notice of his intention to take leave; and (5) the employer denied the employee FMLA benefits to which he was entitled. *Killian*, 454 F.3d at 556 (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)). DCI argues that Chaniott cannot satisfy any of the three latter prongs of that *prima facie* case, because he was not entitled to, did not give notice of intention to, and was not denied the opportunity to take FMLA leave. DCI points out that Chaniott never claimed that his depression or anxiety had required him to wholly take leave from work, but merely to have his shift changed.

To qualify for coverage under the FMLA, an employee must have "'a serious health condition that makes the employee unable to perform the functions of . . . [his] position,'" or establish one of several "other qualifying reasons" that are not relevant to this case. *George v. Russell Stover Candies, Inc.*, 106 F. App'x 946, 949 (6th Cir. 2004) (quoting 29 U.S.C. § 2612(a)(1)(D)). For an employee's condition to qualify as serious under the FMLA, it must result in a "period of incapacity of more than three consecutive, full calendar days." 29 C.F.R. § 825.115(a).

DCI argues first that Chaniott's condition and requests did not implicate the FMLA, because his condition did not prevent him from doing his job, but merely from doing it on the night shift. That argument might be persuasive if the evidence conclusively established that a shift change would have been feasible and that working at night was therefore not one of the "functions of" Chaniott's position for the purposes of defining incapacity. 29 U.S.C. § 2612(a)(1)(D). The evidence currently before the court, however, does not fully resolve that question. Chaniott, moreover, did, in fact, ask for and receive time off due to his condition, and he communicated to DCI that his condition made him unable to work nights. He also asked to access the leave days available in the ESB. "An employee need not use any magic words, or even expressly mention FMLA, in a request for leave. 'Rather, the critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job.'" *McFall v. BASF Corp.*, 406 F. Supp. 2d 763, 768 (E.D. Mich. 2005) (citing *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir.2004)). A reasonable juror could construe Chaniott's communications with DCI as requesting that he be given an accommodation or be permitted to continue to take leave until either an accommodation

24

was possible, his condition was under control, or his leave time ran out. That is particularly true given that, by DCI's own policies, once Chaniott missed three shifts, he should have been placed into the FMLA process, regardless of how he characterized his request.

DCI argues next that the FMLA does not apply to Chaniott's situation because he only took two days of leave at his own request, with the rest of his time off ordered by Bledsoe. The FMLA's three-day rule, however, applies to the amount of time that an employee is incapacitated, not how his employer unilaterally classifies the time away from work. 29 C.F.R. § 825.115(a). It would fly in the face of the FMLA's guarantees if an employer could avoid the Act merely by reclassifying leave as employer-ordered. Indeed, if anything, the fact that Bledsoe intervened just in time to keep Chaniott at home without triggering the company's FMLA process could be construed as bolstering the inference that she was seeking to interfere in his ability to assert his leave rights. A reasonable juror could therefore conclude that Chaniott's condition qualified him for FMLA leave and that he requested that leave as an alternative to reassignment.

DCI does not identify any other basis for disputing the *prima facie* case for FMLA interference. That therefore brings this claim, like his ADA claims, back to the well-worn issue of legitimate nondiscriminatory reason and pretext. As the court has already explained, those issues cannot be resolved on summary judgment in this case. The court will therefore deny DCI's motion as to Chaniott's FMLA interference claim.

### 2. Retaliation

To establish a *prima facie* case of FMLA discrimination/retaliation under § 2615(a)(2), the plaintiff must show that (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there

was a causal connection between the protected FMLA activity and the adverse employment action. *Killian*, 454 F.3d at 556 (citing *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)). DCI's argument regarding FMLA retaliation mirrors its argument regarding FMLA interference; it argues that, other than requesting and receiving leave for two shifts before Bledsoe told him to continue to stay home, Chaniott was not seeking leave and therefore was not engaged in any activity protected by the FMLA. Those arguments fail here just as they fail with regard to FMLA interference. Sufficient facts exist to allow a reasonable juror to conclude that Chaniott was unable to work his assigned job—which required him to work at night—for a period of more than three days and that he requested leave until the situation could be rectified. He was fired shortly thereafter, and reasonable jurors could disagree regarding DCI's stated reason for the termination. The court will therefore deny DCI's motion with regard to FMLA retaliation as well.

## IV. CONCLUSION

For the foregoing reasons, DCI's Motion for Summary Judgment (Docket No. 24) will be denied in its entirety.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

26